EVA P. CROPSEY

*v.*

CHARLES D. CROPSEY.

[Argued and decided April 16th, 1917.]

1. The burden of proof of establishing fraud is upon the complainant, and the rule that in transactions between a wife and husband a presumption of fraud arises that must be overcome by the husband does not apply to an action by the wife to set aside a deed by her to a third person, and from the third person to the husband and wife, where it is shown that the property was purchased by their joint savings.

2. As a rule, where a husband causes property to be transferred to his wife there is a rebuttable presumption that the transfer was a gift.

3. The rule is less rigid to rebut the presumption that such transfer was a gift and to prove it was a trust, where the trust is set up in defence of a deed alleged to have been given in discharge of the trust.

4. The evidence in this cause *held* not to show the alleged fraud by the husband in procuring the deeds.

On bill, &c.

BACKES, V. C.

This bill is filed by Mrs. Cropsey against her husband, Dr. Cropsey, to set aside conveyances of their home in Rutherford; one made by Mrs. Cropsey and her husband to Cook Conkling, and the other by Conkling to Mr. and Mrs. Cropsey, dated May 29th, 1913. The cause for action is fraud imposed by the husband upon the wife, namely, that he coerced her into signing the deed by threats of abandonment, and induced her to execute it upon the fraudulent promises that he would cease attentions to another woman, mend his ways in other respects, and resume conjugal relations, all of which, it is charged, he failed to do.

The burden of establishing the fraud is upon the complainant, although in actions of a certain class, by a wife against her husband, to set aside a conveyance of her property, a presumption of fraud arises, which the husband must overcome. For

instance, if this deed were a pure gift by the wife to the husband of her property, the burden would be upon the husband to show that it was her voluntary act, and I incline that he would also be obliged to show that she had the benefit of independent advice, or at least, as the books lay it down, the burden would be upon him to prove that he did not deceive or oppress her and that he dealt fairly with her and that she understood the nature of the transaction. But this is not a gift case to which the rule applies, as I understand it. Here the husband got from his wife that which in fact belonged to him.

This couple were married, as I recall, in 1892, and for many years, during the struggling period, got along happily. Both worked and saved money together; he as a physician and she as a singer and music-teacher. She was the treasurer; they had but one pocketbook, and this she controlled. She managed the finances and ran his books and bank accounts. With the accumulations they bought a lot and put the title in her name and out of their savings they built their home in 1905, costing some six or seven thousand dollars; and later they paid off some of the mortgage encumbrance. The greater portion of the money came from the doctor's practice. Somewhere in the evidence it appears that the object of putting the title in Mrs. Cropsey was to protect it from the consequences of possible lawsuits against the doctor. Later in life, and some six or seven years ago, their relations became somewhat strained, largely due, as I take it, to his persistent demands and her refusal to transfer the home to the name of the two. The ill-feeling gradually increased and they drifted further apart, and when Dr. DeBaun came into her life it reached an acute stage, which resulted in complete estrangement. After he came on the scene she was not as constant in wifely deportment, to put it mildly, as she ought to have been. For two years Dr. DeBaun's attentions to Mrs. Cropsey were marked, which served to intensify the bitterness upon the part of her husband, whose close and intimate friend Dr. DeBaun had been for many years. He was a free visitor at the house, calling almost daily, day and night, whether the doctor was home or absent, and their conduct and escapades finally led to the divorce court, Dr. Cropsey charging his wife with adul-

tery with Dr. DeBaun, she counter-charging him with a like offence with two women whom she named. I tried that case, and dismissed the cross-petition because the charges were entirely unfounded, and also dismissed the doctor's petition. I denied him a decree, not that there was not an abundance of evidence calculated to arouse a strong suspicion of wrongdoing, but solely because the proof did not measure up to the legal requirements to justify judging her guilty. The final separation took place in July or August of 1913, after a Mrs. Thompson disclosed to Dr. Cropsey the misbehavior of his wife and Dr. DeBaun at her home the summer before, and the impending scandal and exposures of a threatened divorce suit was followed shortly by the death of Dr. DeBaun by suicide, as I understand. I do not know that, in drawing upon my memory, I am referring to the testimony in this case or the testimony in the divorce suit—I am unable to distinguish just now—but it does appear in the one or the other, and if it does not appear in the one I am trying, it must be disregarded.

As a rule, where a husband transfers his property to his wife, or causes it to be transferred to her, it is presumed to be a gift, but this is a mere presumption and, like all other presumptions, may be rebutted. Looking into the circumstances of this case—the singleness of purpose of husband and wife earning and saving in common to buy a home; his daily earnings and income contributing largely to the fund—the lifetime savings of the two, and the complete understanding that the home was to be the property of both, though title was put in the wife, and that upon the death of either it was to go to the survivor—we find there was in morals and common justice, at least, a most sacred trust; perhaps unenforceable because of the presumption of gift and the rule requiring resulting trusts to be definitely established by satisfactory and convincing proof. But the rule is far less rigid to rebut the presumption and to prove the trust, where the trust is set up in defence of a deed alleged to have been given in discharge of the trust.

The doctor had been insisting upon this deed for years, because, as he says, they had no children, and if his wife should die first his rights would be lost; and, indeed, it appears from

Mrs. Cropsey's testimony that to guard against such an event she had made a will in his favor. As between himself and his wife, things were going from bad to worse. Discord reigned supreme in the household. Dr. DeBaun's attentions and presence in the house had become so objectionable to Dr. Cropsey that he ordered him to stay away, but despite this Mrs. Cropsey entertained him. The night before the day the deed was executed De-Baun was a caller. This succeeded an occasion by two or three days when Dr. Cropsey found his wife and DeBaun in darkness in the house, and, according to his story, under most peculiar and suspicious circumstances. As I recall his testimony, her hair was disarranged, her face flushed. On the night in question, DeBaun and Mrs. Cropsey returned home about one o'clock in the morning; the doctor says they had been drinking and that they drank after they returned, and that he saw them from upstairs caressing and kissing. True, or not, he accused them of it and put DeBaun out, with orders to stay away, which were promptly disregarded by DeBaun's return the next evening or the evening after—to apologize, it is said. The anger of the doctor and the scene that night must have impressed Mrs. Cropsey that the climax, the point of separation, was near; and just how it came about that at this time Mrs. Cropsey yielded to her husband's longing for his share of the property, the stories of the two differ. He says that the next morning at the breakfast table she made the offer; while, on the contrary, she says that he threatened to leave her, and fearful that he would, and relying upon his promise to give up a named woman and that he would become fully reconciled, she agreed. At any rate, after breakfast they went to Mr. Conkling's office, a reputable lawyer in Rutherford, and detailed to him what was wanted, and after a full explanation of the effect and consequences, they were told to return at two o'clock when the deed would be ready and when it was signed and acknowledged before a Mr. Miller, a master of this court, and left with Mr. Conkling for recording. In the meantime, Dr. Cropsey returned to his house to fetch the title deeds for the draft. Later in the day, Mrs. Cropsey telephoned to the lawyer to withhold the deed from record, but on the following Monday she retracted by a note directing that it be re-

corded. I cannot credit Mrs. Cropsey's story that she signed the deed under pressure of her husband's threat to abandon her, and that she signed it against her will, and that she told the lawyer—Conkling—that what she was about to do was against her will, and that the deed was not of her own free will, but was done to please the doctor. I doubt very much that Mr. Conkling, under such circumstances, would have consented to act as the conduit, and I am satisfied that he fully explained to her the consequences and that she acted understandingly and willingly. If there had been any connivance between him and Dr. Cropsey, he certainly would not, later on in the afternoon, when Mrs. Cropsey telephoned to him, have kept the deed from the record. I doubt not that Dr. Cropsey many times upbraided his wife because of her conduct and threatened to leave home—and he couldn't be blamed if he had—but I have no confidence in her story that she was moved to sign the deed by his promise of future continence. Such threats, if we may believe her, had often been made before and with the same design, and she always strenuously resisted, and, therefore, why capitulate at this time? As I review the situation, Mrs. Cropsey sensed her husband's suspicion of her misconduct with Dr. DeBaun. His discovery of a few nights before had brought on a crisis and to appease him, to avoid an open break, to maintain her status publicly as his wife, she relinquished. This was her gain. She was impelled by motives of self-preservation, conscious that she was simply restoring to him his own and discharging the trust he put in her years before when love and affection and confidence ruled. Her attempted repudiation of the deed in the afternoon shows no more than that she regretted the step she had taken and does not argue that her action earlier in the day was unwilling; for, as I have said, Mrs. Cropsey's jealousy of the other woman was without foundation, in fact, and her whim a mere subterfuge. That her action was deliberately considered and freely consummated, without haste or urgency on the part of her husband, is borne out by the fact that they first consulted counsel without taking with them their title deeds, which ordinarily would not have been the case had her conduct been precipitate and coerced; having placed her in dire fear and deluded her by false promises, as she

says was the case, we would naturally expect he would supply himself with the means for a hurried accomplishment.

The complainant has not made out her case and the bill will be dismissed.